UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Vita Nuova Inc.**, on behalf of itself and others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **Alex M. Azar II**, in his official capacity as Secretary of Health and Human Services; **United States of America**, <br><br> Defendants. | Case No. 4:19-cv-532 |

## COMPLAINT—CLASS ACTION

Vita Nuova Inc. is a Christian, pro-life organization that wishes to participate in the federal government's Title X program. Since 2000, however, the Department of Health and Human Services has compelled Title X recipients to provide abortion counseling and referrals as a condition of participating in the program. *See* Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,281 (July 3, 2000) (quoting 42 C.F.R. § 59.5(a)(5)). The rule makes no exceptions for Title X recipients that oppose abortion for sincere religious reasons.

On March 4, 2019, the Department announced a final rule that would repeal this requirement. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,716–17, 7788 (March 4, 2019). But the implementation of this final rule has been thwarted on account of nationwide injunctions issued by two federal district courts. As a result of these nationwide injunctions, the requirements of the 2000 rule remain in effect, which compel every Title X recipient to provide abortion counseling and referrals upon a patient's request.

Vita Nuova is unwilling to provide abortion counseling or referrals on account of its Christian beliefs, and it will not participate in the Title X program if these requirements remain in effect. But the agency rule that requires abortion counseling or referrals—with no exceptions for religious organizations such as Vita Nuova—violates the Religious Freedom Restoration Act and numerous federal conscience laws. Vita Nuova seeks declaratory and injunctive relief against this unlawful agency regulation.

Vita Nuova also sues to compel the Secretary of Health and Human Services to comply with the Title X statute, which strictly forbids the Secretary to provide Title X funds to "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Since 2000, the Department has been violating this statutory command by funding programs that provide abortion referrals and abortion counseling; that encourage, promote, and advocate for abortion; and that fail to maintain physical and financial separation between their Title X services and their abortion-related activities. *See* Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,281–82 (July 3, 2000). The Department sought to correct these problems in its final rule of March 4, 2019. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,723 (March 4, 2019). But the Department's efforts to withhold funds from these non-compliant programs have been stymied by nationwide injunctions that have been entered against the final rule. Vita Nuova seeks declaratory and injunctive relief that compels the Secretary to terminate funding of these non-compliant programs and to redirect that money to entities such as Vita Nuova that are willing to comply with the strictures imposed by the Title X statute.

Vita Nuova faces additional obstacles to participating in the Title X program because of its sincere religious beliefs. The Department of Health and Human Services, for example, requires all of its grant recipients to recognize same-sex marriage, and it provides no exemptions or accommodations for organizations (such as Vita Nuova)

that oppose homosexual behavior for sincere religious reasons. *See* 45 C.F.R. § 75.300(d). In addition, a federal statute requires all Title X recipients to allow their employees to perform or assist in abortions, with no exemptions or accommodations for religious organizations (such as Vita Nuova) that oppose elective abortion. *See* 42 U.S.C. § 300a-7(c)(1). Each of these requirements violates the Religious Freedom Restoration Act, because they fail to exempt entities (such as Vita Nuova) that oppose abortion and homosexual behavior for religious reasons. Vita Nuova is seeking declaratory relief and a permanent injunction against their enforcement.

## JURISDICTION AND VENUE

1.   The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.   Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.   Plaintiff Vita Nuova Inc. is a nonprofit incorporated under the laws of Texas.

4.   Defendant Alex M. Azar II is the U.S. Secretary of Health and Human Services. His office is located at 200 Independence Avenue SW, Washington, D.C. 20201. Secretary Azar is sued in his official capacity.

5.   Defendant United States of America is the federal government of the United States of America.

## STATEMENT OF FACTS

6.   The Title X program authorizes the Secretary of Health and Human Services to award grants and contracts to entities that provide family-planning services. *See* 42 U.S.C. §§ 300(a).

7.   The Title X statute forbids the Secretary to fund any "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. *See id.* ("None of the funds

appropriated under this subchapter shall be used in programs where abortion is a method of family planning.").

## I.   THE 1988 RULES

8.   In 1988, the Secretary interpreted this language to prohibit Title X programs from providing abortion counseling or abortion referrals. *See* Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects, 53 Fed. Reg. 2,922, 2945 (Feb. 2, 1988) (quoting agency rule formerly codified at 42 C.F.R. § 59.8) (attached as Exhibit 1).

9.   The 1988 rules also prohibited Title X programs from engaging in activities that "encourage, promote or advocate abortion as a method of family planning," such as pro-abortion lobbying or litigating. *See id*. at 2,945–46 (quoting agency rule formerly codified at 42 C.F.R. § 59.10). The 1988 rules specifically prohibited Title X programs from paying dues to any group that advocates for abortion as a method of family planning. *See id*. at 2,945 (quoting agency rule formerly codified at 42 C.F.R. § 59.10(a)(3)).

10.   The 1988 rules also required Title X programs to be "physically and financially separate" from abortion-related activities. *See id*. at 2945 (quoting agency rule formerly codified at 42 C.F.R. § 59.9).

11.   The Supreme Court upheld the Secretary's 1988 rules as a permissible interpretation of the Title X statute in *Rust v. Sullivan*, 500 U.S. 173 (1991).

## II.   THE 2000 RULES

12.   In 1993, the Secretary suspended the 1988 regulations and proposed a new rule. *See* Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7462 (February 5, 1993) (attached as Exhibit 2).

13.   In 2000, the Secretary issued a final rule that formally revoked the 1988 regulations. *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270 (July 3, 2000) (attached as Exhibit 3); Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281 (July 3, 2000) (attached as Exhibit 4).

14.   Under the 2000 rules, Title X recipients are not only permitted but *required* to provide abortion counseling or abortion referrals upon request. *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270, 41,279 (July 3, 2000) (quoting provision formerly codified at 42 C.F.R. § 59.5(a)(5); Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41281 (July 3, 2000) (same). There is no exception made for Title X programs that oppose abortion on account of their religious beliefs or moral convictions.

15.   The 2000 rules also repealed the prohibition on the payment of dues to groups that advocate for abortion as a method of family planning. *See* Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41282 (July 3, 2000) ("A Title X project may be a dues paying participant in a national abortion advocacy organization, so long as there are other legitimate program-related reasons for the affiliation (such as access to certain information or data useful to the Title X project).").

16.   Finally, the 2000 rules diluted the requirement to separate abortion-related activities from the Title X program. They allow Title X programs to operate at abortion clinics. *See id*. at 41282 ("Separation of Title X from abortion activities does not require separate grantees or even a separate health facility"). And they specifically allow the Title X program to share waiting rooms, staff, and filing systems with abortion providers. *See id*.

## III.   The 2019 Rules

17.   In 2019, the Secretary determined that the 2000 rules violated the Title X statute and federal conscience-protection laws. On March 4, 2019, the Secretary issued a final rule that revoked each of the provisions described in paragraphs 14–16. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714 (March 4, 2019) (attached as Exhibit 5).

### A.    Abortion Referrals No Longer Compelled Or Even Permitted

18.   The final rule determined that the requirement to provide abortion referrals in the 2000 rules violated the Title X statute. Indeed, the final rule concluded that even *permitting* abortion referrals in a Title X program would violate the terms of 42 U.S.C. § 300a-6:

> The Department believes that, in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning. The Department believes both the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs.

Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,717 (March 4, 2019). The final rule therefore announced that Title X recipients would be *forbidden* to provide referrals for abortion as a method of family planning — rather than being *required* to do so under the 2000 rules. *See id*. at 7,788 (quoting 42 C.F.R. § 59.5(a)(5)); *id*. at 7,789 ("A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." (quoting 42 C.F.R. § 59.14(a)).

19.   The final rule also noted that the requirement to provide abortion referrals in the 2000 rules violated numerous federal conscience-protection laws, including the Church Amendment, the Coats–Snowe Amendment, and the Weldon Amendment.

*See id.* at 7,717 ("[T]he Department believes the referral requirement is in conflict with federal conscience protections, such as the Church, Coats–Snowe, and Weldon Amendments, for individual and institutional entities which object").

### B.   Abortion Counseling No Longer Compelled; Only "Nondirective Pregnancy Counseling" Permitted

20.   The final rule also determined that the requirement to provide abortion counseling in the 2000 rules violated the Title X statute, as well as federal conscience-protection laws including the Church Amendment, the Coats–Snowe Amendment, and the Weldon Amendment. *See id.* at 7,716. The final rule therefore announced that Title X recipients would no longer be *required* to provide abortion counseling, although it makes clear that the only permissible form of abortion-related counseling is "nondirective pregnancy counseling." *See id.* at 7,789 (quoting 42 C.F.R. § 59.14(b)(1)). This "nondirective pregnancy counseling" may discuss abortion, but it may not encourage abortion nor provide abortion referrals. *See id.* at 7,789 (quoting 42 C.F.R. § 59.14(e)(5)).

### C.   Prohibition On Activities That Encourage, Promote, Or Advocate For Abortion

21.   The final rule takes steps to ensure that Title X programs do not encourage, promote, or advocate for abortion as a method of family planning in any way. The final rule specifically prohibits the use of Title X funds for any of the following activities:

> (i) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;
>
> (ii) Providing speakers or educators who promote the use of abortion as a method of family planning;
>
> (iii) Attending events or conferences during which the grantee or sub-recipient engages in lobbying;

(iv) Paying dues to any group that, as a more than insignificant part of its activities, advocates abortion as a method of family planning and does not separately collect and segregate funds used for lobbying purposes;

(v) Using legal action to make abortion available in any way as a method of family planning; and

(vi) Developing or disseminating in any way materials (including printed matter, audiovisual materials and web-based materials) advocating abortion as a method of family planning.

*See id.* at 7,790 (quoting 42 C.F.R. § 59.16(a)(2)).

> **D.    Maintenance of Physical and Financial Separation Between A Title X Program And Abortion Activities**

22.    The final rule determined that the 2000 rules violated the Title X statute by allowing Title X programs to operate at abortion clinics and to share waiting rooms, staff, and filing systems with abortion providers. *See id.* at 7,715 ("[P]hysical and financial separation . . . is consistent with the plain text of Section 1008, legislative history, and case law."). The final rule concluded that permitting Title X programs to operate at abortion facilities allows for the "intentional or unintentional co- mingling of Title X resources with non-Title X resources or programs." *Id.*

23.    The final rule corrects this by requiring Title X providers to maintain "physical and financial separation from locations which provide abortion as a method of family planning." *Id.*; *see also id.* at 7,789 (quoting 42 C.F.R. § 59.15)).

## IV.    THE NATIONWIDE INJUNCTIONS AGAINST THE FINAL RULE

24.    The final rule took effect on May 3, 2019. But two federal district courts have already issued nationwide preliminary injunctions against its enforcement. *See Washington v. Azar*, No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash.) (April 25, 2019); *Oregon v. Azar*, No. 6:10-cv-00317 (ECF No. 142) (D. Oregon) (April 29, 2019).

25. Two additional district courts have enjoined the Secretary from enforcing the final rule, but those courts declined to issue nationwide injunctions. *See California v. Azar*, No. 3:19-cv-01184-EMC (ECF No. 103) (N.D. Cal.) (April 26, 2019); *City and County of Baltimore v. Azar*, No. 1:19-cv-01103-RDB (ECF No. 43) (May 30, 2019).

26. On June 20, 2019, a three-judge panel of the Ninth Circuit unanimously stayed the injunctions that had been entered in *Washington*, *Oregon*, and *California*.

27. On July 2, 2019, a divided three-judge panel of the Fourth Circuit stayed the injunction that had been entered in *City and County of Baltimore*.

28. As a result of these stays, the final rule was allowed to take effect nationwide.

29. On July 3, 2019, however, the Ninth Circuit ordered the *Washington*, *Oregon*, and *California* cases reheard en banc and vacated the earlier stay issued by the three-judge panel. As a result of this order, the injunctions issued in *Washington*, *Oregon*, and *California* remain in force.

30. Because of the nationwide injunctions issued in *Washington v. Azar* and *Oregon v. Azar*, the Secretary cannot implement any aspect of the final rule in any situation, and the unlawful policies in the 2000 rules remain in effect. Vita Nuova is seeking judicial relief that will stop the Secretary from enforcing the 2000 rules to the extent that they violate the Title X statute, the Religious Freedom Restoration Act, and federal conscience-protection laws, and it is seeking relief that will prevent the Secretary from funding non-compliant Title X programs.

## CLAIM #1—COMPELLED ABORTION COUNSELING AND REFERRALS

31. The Secretary is enforcing an agency rule that not only permits but *compels* Title X recipients to provide abortion counseling and referrals upon demand. *See* Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,281 (July 3, 2000) (quoting 42 C.F.R. § 59.5(a)(5)).

32.   This agency rule violates the Religious Freedom Restoration Act, because it fails to exempt Title X recipients and applicants that object to abortion for sincere religious reasons. This substantially burdens Vita Nuova's exercise of religion because it disqualifies Vita Nuova from participating in the Title X program for exercising its religious beliefs. And there is no compelling governmental interest in compelling Title X recipients to provide abortion referrals, because abortion is not to be used as a method of family planning in any program that receives Title X funds. *See* 42 U.S.C. § 300a-6.

33.   This agency rule also violates federal conscience-protection laws, including the Church Amendment, the Coates–Snowe Amendment, and the Weldon Amendment, as the Secretary has recognized. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,717 (March 4, 2019) ("[T]he Department believes the referral requirement is in conflict with federal conscience protections, such as the Church, Coats–Snowe, and Weldon Amendments, for individual and institutional entities which object").

34.   Finally, this agency rule violates the Title X statute because it requires Title X funds to be "used" in "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. A Title X program that provides abortion referrals and abortion counseling—apart from the nondirective pregnancy counseling permitted under the final rule—is aiding and abetting the very act of abortion, and it becomes an accomplice to those who obtain or perform the abortion as a method of family planning.

35.   The Secretary agrees that this feature of the 2000 rules violates the terms of the Title X statute. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,717 (March 4, 2019) ("[B]oth the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method

of family planning, contrary to the prohibition against the use of Title X funds in such programs.").

36.   The Court should therefore:

    a.   Declare that the 2000 rules violate RFRA, the Church Amendment, the Coates–Snowe Amendment, the Weldon Amendment, and the Title X statute, to the extent that they require Title X recipients or programs to provide abortion referrals or abortion counseling;

    b.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from enforcing any statute, rule, policy, or agency guidance document that compels Title X recipients or programs to provide abortion referrals or abortion counseling;

    c.   hold unlawful and set aside the 2000 rules, to the extent they require Title X recipients or programs to provide abortion referrals or abortion counseling.

### CLAIM #2—FUNDING TITLE X PROGRAMS THAT PROVIDE ABORTION REFERRALS AND COUNSELING

37.   The Secretary is currently funding Title X programs that provide abortion referrals and counseling. *See* Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281, 41,281 (July 3, 2000) (quoting 42 C.F.R. § 59.5(a)(5)).

38.   Although the Secretary's final rule prohibits Title X programs from providing abortion referrals and counseling (apart from the nondirective pregnancy counseling described in the final rule), *see* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,788 (quoting 42 C.F.R. § 59.5(a)(5)); *id.* at 7,789 (quoting 42 C.F.R. § 59.14(a)); *id.* at 7,789 (quoting 42 C.F.R. § 59.14(e)(5)), the nationwide injunctions in *Washington* and *Oregon* prevent the Secretary from enforcing these prohibitions.

39.   The Title X statute forbids the Secretary to fund Title X programs that provide abortion referrals and counseling (apart from the nondirective pregnancy counseling described in the final rule), because it causes Title X funds to be "used" in "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. A Title X program that provides abortion referrals and abortion counseling—apart from the nondirective pregnancy counseling permitted under the terms of the final rule—is aiding and abetting the act of abortion, and becomes an accomplice to those who obtain or perform abortions as a method of family planning.

40.   The Secretary agrees that the Title X statute forbids him to fund programs of this sort. *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,717 (March 4, 2019) ("[B]oth the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs.").

41.   The Court should therefore:

a.   Declare that the Secretary is violating the Title X statute by funding Title X programs that provide abortion referrals or abortion counseling, apart from the nondirective pregnancy counseling permitted under the terms of the Secretary's final rule;

b.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from funding any Title X program that provides abortion referrals or abortion counseling, apart from the nondirective pregnancy counseling permitted under the terms of the Secretary's final rule;

c.   hold unlawful and set aside the 2000 rules, to the extent they allow Title X recipients or programs to provide abortion referrals or abortion counseling, apart from the nondirective pregnancy counseling permitted under the terms of the Secretary's final rule.

## CLAIM #3—FUNDING TITLE X PROGRAMS THAT ENCOURAGE, PROMOTE, OR ADVOCATE FOR ABORTION

42.   The Secretary is currently funding Title X programs that encourage, promote, or advocate for abortion as a method of family planning.

43.   Although the Secretary's final rule prohibits Title X programs from engaging in activities of this sort, *see* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,790 (March 4, 2019) (quoting 42 C.F.R. § 59.16(a)(2)); *see also* paragraph 21 (listing the requirements of 42 C.F.R. § 59.16(a)(2)), the nationwide injunctions in *Washington* and *Oregon* prevent the Secretary from enforcing these prohibitions.

44.   The Title X statute forbids the Secretary to fund Title X programs that encourage, promote, or advocate for abortion as a method of family planning by engaging in any of the activities listed in 42 C.F.R. § 59.16(a)(2), and the Secretary is violating the Title X statute by funding programs that fail to comply with those requirements.

45.   The Court should therefore:

   a.   Declare that the Secretary is violating the Title X statute by funding Title X programs that engage in any of the activities described in 42 C.F.R. § 59.16(a)(2);

   b.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from funding any Title X program that engages in any of the activities described in 42 C.F.R. § 59.16(a)(2);

   c.   hold unlawful and set aside the 2000 rules, to the extent they allow the Secretary or the Department to fund any Title X program that engages in any of the activities described in 42 C.F.R. § 59.16(a)(2).

## CLAIM #4—FAILING TO REQUIRE PHYSICAL AND FINANCIAL SEPARATION BETWEEN A TITLE X PROGRAM AND ABORTION ACTIVITIES

46.   The Secretary is currently funding Title X programs that fail to maintain physical and financial separation from abortion-related activities. This includes Title X programs that operate at abortion clinics and that share waiting rooms, staff, and filing systems with abortion providers.

47.   Although the Secretary's final rule prohibits the Department from funding of Title X programs that fail to maintain physical and financial separation from abortion-related activities, *see* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,789 (March 4, 2019) (quoting 42 C.F.R. § 59.15), the nationwide injunctions in *Washington* and *Oregon* prevent the Secretary from enforcing this prohibition.

48.   The Title X statute forbids the Secretary to fund Title X programs that fail to maintain physical and financial separation from abortion-related activities, and the Secretary acknowledges as much. *See id*. at 7,715 ("[P]hysical and financial separation . . . is consistent with the plain text of Section 1008, legislative history, and case law.").

49.   The Court should therefore:

   a.   Declare that the Secretary is violating the Title X statute by funding Title X programs that fail to maintain physical and financial separation from abortion-related activities, as required by 42 C.F.R. § 59.15;

   b.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from funding any Title X program that that fails to maintain physical and financial separation from abortion-related activities, as required by 42 C.F.R. § 59.15;

   c.   hold unlawful and set aside the 2000 rules, to the extent they allow the Secretary or the Department to fund any Title X program that

that fails to maintain physical and financial separation from abortion-related activities, as required by 42 C.F.R. § 59.15.

## CLAIM #5—COMPELLED RECOGNITION OF SAME-SEX MARRIAGE

50.  Vita Nuova wishes to participate in the Title X program, and it is preparing to apply for Title X grants at the next available opportunity.

51.  The Department of Health and Human Services, however, requires all of its grant recipients to recognize same-sex marriage, and it makes no exceptions for recipients who oppose homosexuality for sincere religious reasons. *See* 45 C.F.R. § 75.300(d) ("In accordance with the Supreme Court decisions in United States v. Windsor and in Obergefell v. Hodges, all recipients must treat as valid the marriages of same-sex couples.") (attached as Exhibit 6).

52.  The Department issued 45 C.F.R. § 75.300(d) as part of a final rule that took effect on January 11, 2017. The final rule is Health and Human Services Grants Regulation, 81 Fed. Reg. 89,393 (December 12, 2016), and it is attached to this complaint as Exhibit 7.

53.  Vita Nuova is unwilling to recognize same-sex marriage on account of its Christian beliefs, and it will not accept Title X funds if it is compelled to recognize same-sex marriage as a condition of participating in the Title X program.

54.  A rule that compels HHS grant recipients to recognize same-sex marriage violates the Religious Freedom Restoration Act because it fails to exempt recipients that object to homosexual behavior and same-sex marriage for sincere religious reasons. This substantially burdens Vita Nuova's exercise of religion because it disqualifies Vita Nuova from participating in the Title X program as a consequence of exercising its religious beliefs. And there is no compelling governmental interest in compelling HHS grant recipients to recognize same-sex marriage, because they are private entities who are not bound by the Supreme Court's rulings in *Windsor* or *Obergefell*.

*See United States v. Cruikshank*, 92 U.S. 542, 554 (1875) ("The fourteenth amend-ment prohibits a State from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against an-other."); Ruth Bader Ginsburg, *Sexual Equality Under the Fourteenth Amendment and Equal Rights Amendments*, 1979 Wash. U. L.Q. 161 ("Both the equal protection and the equal rights formulations are directed to laws and the actions of officialdom; private action unaccompanied by official participation or stimulation remains outside the purview of both provisions.").

55.   More importantly, the Secretary has no statutory authority to impose a re-quirement on this sort on HHS grant recipients. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). There is no Act of Congress that even re-motely authorizes the Secretary to compel recognition of same-sex marriage by private entities that receive HHS grants.

56.   The Court should therefore:

    a.   Declare that 45 C.F.R. § 75.300(d) violates the Religious Freedom Restoration Act and is not authorized by any congressional enact-ment;

    b.   hold unlawful and set aside 45 C.F.R. § 75.300(d) under section 706 of the APA (5 U.S.C. § 706);

    c.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and succes-sors, as well as any person acting in concert or participation with them, from enforcing 45 C.F.R. § 75.300(d);

    d.   Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and succes-sors, as well as any person acting in concert or participation with them, from requiring any private citizen or entity to recognize same-sex marriage as a condition of receiving federal funds, until Congress

enacts legislation that authorizes the Secretary to impose such a requirement;

e.  Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from requiring any private citizen or entity that opposes same-sex marriage for sincere religious reasons to recognize same-sex marriage as a condition of receiving federal funds, until Congress enacts legislation that authorizes the Secretary to impose such a requirement and that exempts the Secretary from the requirements of the Religious Freedom Restoration Act.

## CLAIM #6—CLASS-ACTION RFRA CHALLENGE TO 42 U.S.C. § 300a-7(c)

57.   42 U.S.C. § 300a-7(c)(1) forbids Title X recipients to "discriminate in the employment, promotion, or termination of employment of any physician or other health care professional" who performs or assists in elective abortions. 42 U.S.C. § 300a-7(c)(1) (attached as Exhibit 8).

58.   42 U.S.C. § 300a-7(c)(1)'s restrictions apply not only to Title X recipients, but to every entity that receives a grant, contract, loan, or loan guarantee under the Public Health Service Act, 42 U.S.C. § 201 et seq., the Community Mental Health Centers Act, 42 U.S.C. § 2689 et seq., or the Developmental Disabilities Services and Facilities Construction Act, 42 U.S.C. § 6000 et seq. *See* 42 U.S.C. § 300a-7(c)(1). A separate statutory provision imposes similar requirements on every entity that receives a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services. *See* 42 U.S.C. § 300a-7(c)(2).

59.   42 U.S.C. § 300a-7(c)(1) and (c)(2) contain no exemptions or accommodations for religious entities that oppose abortion for sincere religious reasons.

60.   Vita Nuova requires all of its employees to respect the sanctity of human life at all times, both on and off the job. Vita Nuova will not allow its doctors to perform

elective abortions, nor will it allow its employees to assist in elective abortions, consistent with the employment practices of Catholic hospitals and other Christian health-care entities that oppose abortion for sincere religious reasons.

61.  A statute that compels HHS grant recipients to allow their employees to perform or assist in elective abortions conflicts with the Religious Freedom Restoration Act to the extent that it fails to exempt recipients that object to abortion for sincere religious reasons. This substantially burdens Vita Nuova's exercise of religion because it prevents Vita Nuova from participating in the Title X program unless it allows its employees to perform or assist in elective abortions, in direct contravention of Vita Nuova's religious beliefs. There is no compelling governmental interest in compelling religious health-care entities to employ individuals whose behavior is directly contrary to the organization's values, nor is there a compelling governmental interest in excluding these religious health-care entities from Title X and other federally funded programs.

62.  The Court should therefore:

a.  Certify a class under FRCP 23(b)(2) that includes every present and future entity in the United States that: (i) Opposes abortion for sincere religious reasons; and (2) Is receiving or intends to apply for a grant, contract, loan, or loan guarantee under the Public Health Service Act, 42 U.S.C. § 201 et seq., the Community Mental Health Centers Act, 42 U.S.C. § 2689 et seq., or the Developmental Disabilities Services and Facilities Construction Act, 42 U.S.C. § 6000 et seq., or a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services;

b.  Declare that 42 U.S.C. §§ 300a-7(c)(1) and (c)(2)'s requirements conflict with the Religious Freedom Restoration Act, but only as applied to entities that oppose abortion for sincere religious reasons, and only to the extent that they prohibit such entities from discriminating against physicians and health-care personnel that performed or assisted in the performance of abortions;

    c.  Permanently enjoin the Secretary, along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them, from enforcing 42 U.S.C. §§ 300a-7(c)(1) and (c)(2) against entities that oppose abortion for sincere religious reasons, to the extent those provisions forbid discrimination against physicians and health-care personnel that performed or assisted in the performance of abortions.

## ARTICLE III STANDING

63.   Vita Nuova has Article III standing to seek this relief because it intends to apply for Title X funding at the next available opportunity. Vita Nuova is suffering injury in fact because: (1) The 2000 rules prevent Vita Nuova from obtaining Title X funding unless it agrees to provide abortion counseling and referrals, in violation of the Title X statute and in violation of its religious beliefs; (2) The Secretary's enforcement of the 2000 rules and its continued funding of non-compliant Title X programs make it more difficult for Vita Nuova to obtain Title X funding, because Vita Nuova must compete with entities that should be categorically excluded from the Title X program on account of their abortion-promoting activities and their affiliations with abortion providers; (3) 45 C.F.R. § 75.300(d) prevents Vita Nuova from obtaining Title X funding unless it agrees to recognize same-sex marriage; (4) 42 U.S.C. §§ 300a-7(c) prevents Vita Nuova from obtaining Title X funding unless it agrees to allow its employees to perform or assist in abortions; and (5) The 2000 rules, 45 C.F.R. § 75.300(d), and 42 U.S.C. §§ 300a-7(c) hinder Vita Nuova's efforts to raise funds and build a network of providers because they purport to prevent entities such as Vita Nuova from qualifying for Title X funds. These injuries are caused by the 2000 rules, 45 C.F.R. § 75.300(d), and 42 U.S.C. §§ 300a-7(c), and they will be redressed by an injunction that prevents the Secretary from enforcing the 2000 rules, 45 C.F.R. § 75.300(d), and 42 U.S.C. §§ 300a-7(c).

## CLASS-ACTION ALLEGATIONS

64.   Vita Nuova brings its challenge to 42 U.S.C. §§ 300a-7(c) as a class action under Rule 23(b)(2) of the federal rules of civil procedure.

65.   The class comprises every current and future entity in the United States that: (i) Opposes abortion for sincere religious reasons; and (2) Is receiving or intends to apply for a grant, contract, loan, or loan guarantee under the Public Health Service Act, 42 U.S.C. § 201 et seq., the Community Mental Health Centers Act, 42 U.S.C. § 2689 et seq., or the Developmental Disabilities Services and Facilities Construction Act, 42 U.S.C. § 6000 et seq., or a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services. *See* 42 U.S.C. §§ 300a-7(c)(1) and (c)(2).

66.   The number of entities in the class makes joinder of the individual class members impractical.

67.   There are questions of law common to the class. All class members are entities that oppose abortion for sincere religious reasons. Yet 42 U.S.C. § 300a-7(c) prevents these entities from participating in federally funded health and research programs unless they are willing to employ individuals whose behavior is directly contrary to the organization's sincere religious values. The common legal questions are whether 42 U.S.C. § 300a-7(c) burdens the religious freedom of these health-care entities that oppose abortion, and whether this burden represents the least restrictive means of advancing a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1.

68.   Vita Nuova's claims are typical of other members of the class. 42 U.S.C. § 300a-7(c) substantially burdens the religious freedom of each class member in the same way—by compelling them to choose between employing individuals whose behavior is directly contrary to the organization's sincere religious values or forgoing federal funding and forfeiting their ability to participate in federally funded health and research programs.

69.   Vita Nuova adequately represents the interests of the class, and it has no interests antagonistic to the class.

70.   A class action is appropriate under Rule 23(b)(2) because the defendants are acting on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## DEMAND FOR RELIEF

71.   Vita Nuova respectfully requests that the court:

a.   certify the class described in paragraph 62(a);

b.   enter the declaratory relief described above under 28 U.S.C. § 2201;

c.   enter the injunctive relief described above under *Ex parte Young*, 209 U.S. 123 (1908), and the Administrative Procedure Act, 5 U.S.C. §§ 702, 704;

d.   hold unlawful and set aside the unlawful agency actions described above under the Administrative Procedure Act, 5 U.S.C. § 706;

e.   award costs and attorneys' fees under 42 U.S.C. § 1988;

f.   award all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, L.L.P.
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: July 3, 2019

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff
and the Proposed Class*