IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| VITA NUOVA, INC., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No.  4:19-cv-00532-O |
| § | |
| ALEX M. AZAR II, in his official § | |
| capacity as Secretary of Health and § | |
| Human Services *et al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

At the heart of this case is 42 U.S.C. § 300a-6—originally Section 1008 of Title X of the Public Health Service Act ("Title X")—the provision prohibiting Title X recipients from using abortion as a method of family planning. Since Title X's genesis, the Department of Health and Human Services's ("HHS") interpretations of § 1008 have resembled a pendulum—oscillating from one stance to another. HHS's current stance supports Plaintiff Vita Nuova, Inc.'s ("Plaintiff" or "Vita Nuova") position. In other words, Vita Nuova and HHS agree on the proper interpretation of § 1008—that the language of Title X does not allow for abortion referrals or abortion counseling. However, Vita Nuova brings this action, *inter alia*, for a declaratory judgment in fear of a recrudescence toward a former interpretive stance—one that would penalize Title X recipients for not providing abortion referrals or counseling. The facts of this case create a labyrinthine setting to navigate; HHS's history of fluctuating interpretations of § 1008 provides a backdrop that lends credence to Vita Nuova's worries. But worries—without more—are not sufficient to overcome Article III standing requirements. Even so, one of Vita Nuova's three claims manages to reach beyond the maze's periphery.

The parties submitted the following documents for the Court's consideration: Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support ("Motion to Dismiss") (ECF No. 17), filed November 12, 2019; Plaintiff's Brief in Opposition (ECF No. 18), filed December 3, 2019; and Defendants' Reply (ECF No. 25), filed January 17, 2020. After reviewing the briefing, record, and applicable law, and for the foregoing reasons, the Court finds that Defendants' Motion to Dismiss should be and is hereby **GRANTED in part** and **DENIED in part**.

I.   **BACKGROUND**

   A.   **History of § 1008**

*California by and through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc) articulates a summarized timeline of HHS's interpretations of § 1008:

> [B]efore the 2018 rulemaking, HHS's interpretations of § 1008 had seesawed through multiple formulations: from permitting—then requiring—nondirective counseling on abortion as a method of family planning (in 1971 and 1981 guidance documents); to prohibiting counseling and referrals for abortion as a method of family planning (in the 1988 Rule, upheld by the Supreme Court in 1991); and then to once again requiring nondirective counseling and referrals for abortion on request (in the 2000 Rule). HHS also vacillated in its interpretation of the federal conscience laws. This uncertain history was the backdrop for HHS's reconsideration of this controversial area in 2018.

*Id.* at 1079. On March 4, 2019, HHS announced a final rule that would "largely represent[] a return to the 1988 Rule." *Id.* at 1080; Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,716–17, 7788 (Mar. 4, 2019) (hereinafter the "2019 Rule").

The 2019 Rule took effect on May 3, 2019, but two federal district courts issued nationwide preliminary injunctions against its enforcement. *See Washington v. Azar*, No. 1:19-cv-03040-SAB (ECF No. 54) (E.D. Wash. Apr. 25, 2019); *Oregon v. Azar*, No. 6:10-cv-00317 (ECF No. 142) (D. Or. Apr. 29, 2019). Two additional district courts enjoined Secretary Alex M. Azar II ("Azar") and the United States Government (collectively "Defendants") from enforcing the 2019 Rule, but

those courts declined to issue nationwide injunctions. *See California v. Azar*, No. 3-19-cv-01184-EMC (ECF No. 103) (N.D. Cal. Apr. 26, 2019); *City and County of Baltimore v. Azar*, No. 1:19-cv-01103-RDB (ECF No. 43) (D. Md. May 30, 2019). On June 20, 2019, a three-judge panel of the Ninth Circuit unanimously stayed the injunctions that had been entered in *Washington*, *Oregon*, and *California*. *See California v. Azar*, 927 F.3d 1068 (9th Cir. 2019).

On July 3, 2019, the Ninth Circuit ordered the *Washington*, *Oregon*, and *California* cases reheard en banc. *See California v. Azar*, 927 F.3d 1045 (9th Cir. 2019). That same day, Vita Nuova—incorporated just the day before—filed its Original Complaint in this Court. *See* Compl., ECF No. 1; Defs.' Mot. Dismiss 6, ECF No. 17. The en banc Ninth Circuit then issued an order on July 11, 2019 clarifying that its July 3, 2019 order did not vacate the earlier stay of the nationwide injunctions. *See California v. Azar*, 927 F.3d 1153 (9th Cir. 2019). Four days after the Ninth Circuit issued this clarifying order, Azar began enforcing the 2019 Rule. On October 28, 2019, Vita Nuova filed an Amended Complaint that is the subject of this Motion to Dismiss. *See* Am. Compl., ECF No. 16.

**B.  Plaintiff's Claims**

Vita Nuova is a Christian, pro-life organization that wishes to participate in the federal government's Title X program. *Id.* at 9. As such, Vita Nuova refuses to provide abortion referrals or abortion counseling. *Id.* at 10. Vita Nuova intends to apply for Title X funds at the next available opportunity in November 2020; the next round of grants is scheduled to be awarded in the Spring of 2021. *Id.* at 9. Vita Nuova contends that the ongoing lawsuits against the 2019 Rule raise the prospect that a court will vacate the 2019 Rule or resurrect the nationwide injunctions against its enforcement. *Id.* Additionally, Vita Nuova avers that the 2019 Rule is certain to be revoked if a Democratic administration takes office in January 2021. *Id.* Several potential donors have told Vita

Nuova that they are unwilling to contribute funds unless Vita Nuova receives assurance that it will remain eligible to participate in Title X, regardless of what happens in the ongoing litigation over the 2019 Rule or the outcome of the next presidential election. *Id.* at 9–10. Due to this, Vita Nova argues that it is suffering present-day injury because these uncertainties are hindering its ability to raise funds and recruit employees. *Id.* at 9. Further, Vita Nuova asserts that there is a substantial risk that it will be disqualified from participating in Title X in the future due to the uncertainties. *Id.* at 10. Vita Nuova thus requests that the Court declare the Religious Freedom Restoration Act ("RFRA")[1] and federal conscience-protection laws—including the Church Amendments,[2] the Coats-Snowe Amendment,[3] and the Weldon Amendment,[4]—prohibit the Government from excluding Vita Nuova from the Title X program on account of its unwillingness to provide abortion referrals or abortion counseling. *Id.*

In addition to § 1008, Vita Nuova highlights two additional obstacles to participating in the Title X program: 1) 45 C.F.R. § 75.300(d); and 2) 42 U.S.C. § 300a-7(c)(1)–(2). *Id.* at 1–2. Vita Nuova's second claim focuses on 45 C.F.R. § 75.300(d)—issued by HHS as part of a final rule that took effect on January 11, 2017. *See* Health and Human Servs. Grants Regulation, 81 Fed. Reg. 89,393 (Dec. 12, 2016); *Id.* at 11. That final rule reads: "[i]n accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples." 45 C.F.R. § 75.300(d). Vita Nuova is unwilling to recognize same-sex marriage on account of its Christian beliefs, and it will not accept Title X funds

---

[1] 42 U.S.C. § 2000bb et seq.

[2] 42 U.S.C. § 300a-7.

[3] 42 U.S.C. § 238n.

[4] Act of Dec. 16, 2009, Pub. L. No. 111-117, 123 U.S.C.C.A.N. (123 Stat. 3034), Title V § 508(d)(1).

if it is compelled to recognize same-sex marriage as a condition of participating in the Title X program. Am. Compl. 11, ECF No. 16. Vita Nuova claims that the "existence and enforcement" of 45 C.F.R. § 75.300(d) inflicts injury-in-fact because it disqualifies Vita Nuova from obtaining Title X funding unless it agrees to recognize same-sex marriage. *Id.* at 12. Vita Nuova also states that 45 C.F.R. § 75.300(d) inflicts further injury because it hinders Vita Nuova's efforts to raise funds and build a network of potential providers due to facially disqualifying devoutly Christian entities that oppose same-sex marriage. *Id.*

To that end, Vita Nuova requests this Court: 1) declare that 45 C.F.R. § 75.300(d) violates RFRA and is not authorized by any congressional enactment; 2) hold unlawful and set aside 45 C.F.R. § 75.300(d) under Section 706 of the APA (5 U.S.C. § 706); 3) permanently enjoin the Secretary of HHS (hereinafter the "Secretary"), along with his officers, agents, servants, employees, attorneys, designees, subordinates, and successors, as well as any person acting in concert or participation with them (collectively "the Secretary and all relevant persons"), from enforcing 45 C.F.R. § 75.300(d); 4) permanently enjoin the Secretary and all relevant persons from requiring any private citizen or entity to recognize same-sex marriage as a condition of receiving federal funds, until Congress enacts legislation that authorizes the Secretary to impose such a requirement; and 5) permanently enjoin the Secretary and all relevant persons from requiring any private citizen or entity that opposes same-sex marriage for sincere religious reasons to recognize same-sex marriage as a condition of receiving federal funds, until Congress enacts legislation that authorizes the Secretary of HHS to impose such a requirement and that exempts the Secretary of HHS from the requirements of RFRA. Am. Compl. 12–13, ECF No. 16.

Vita Nuova's third claim is a class-action RFRA challenge to 42 U.S.C. § 300a-7(c), a provision in the Church Amendments. This statute forbids Title X recipients to "discriminate in

the employment, promotion, or termination of employment of any physician or other health care professional" who performs or assists in elective abortions. *Id.* 42 U.S.C. § 300a-7(c)'s restrictions apply to every entity that receives a grant, contract, loan, or loan guarantee under the Public Health Service Act,[5] the Community Mental Health Centers Act,[6] or the Developmental Disabilities Services and Facilities Construction Act.[7] *See* 42 U.S.C. § 300a-7(c)(1). A separate statutory provision imposes similar requirements on every entity that receives a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services. *See* 42 U.S.C. § 300a-7(c)(2). Neither 42 U.S.C. § 300a-7(c)(1) nor (c)(2) contain exemptions or accommodations for religious entities that oppose abortion for sincere religious reasons. Vita Nuova requires all of its employees to respect the sanctity of human life at all times, both on and off the job. Am. Compl. 14, ECF No. 16. Vita Nuova will not allow its doctors to perform elective abortions, nor will it allow its employees to assist in elective abortions. *Id.* Vita Nuova contends that 42 U.S.C. § 300a-7(c) substantially burdens its exercise of religion because it prevents Vita Nuova from participating in the Title X program unless it allows it employees to perform or assist in elective abortions. *Id.* Similar to the argument for their second claim, Vita Nuova claims that Azar's enforcement of 42 U.S.C. § 300a-7(c) inflicts injury in fact because it prevents Vita Nuova from obtaining Title X funding unless it agrees to act directly in contravention of its religious beliefs. *Id.* As such, Vita Nuova submits that enforcement of 42 U.S.C. § 300a-7(c) also hinders its efforts to raise funds and build a network of potential providers. *Id.*

---

[5] 42 U.S.C. § 201 et seq.

[6] 42 U.S.C. § 2689 et eq.

[7] 42 U.S.C. § 6000 et seq.

To that end, Vita Nuova requests that the Court: 1) certify a class under Federal Rule of Civil Procedure 23(b)(2) that includes every present and future entity in the United States that: (i) opposes abortion for sincere religious reasons; and (ii) is receiving or intends to apply for a grant, contract, loan, or loan guarantee under the Public Health Service Act, Community Mental Health Centers Act, Developmental Disabilities Services and Facilities Construction Act, or a grant or contract for biomedical or behavioral services under any program administered by the Secretary; 2) declare that 42 U.S.C. § 300a-7(c)(1) and (c)(2)'s requirements conflict with RFRA, but only as applied to entities that oppose abortion for sincere religious reasons, and only to the extent that they prohibit such entities from discriminating against physicians and health-care personnel that performed or assisted in the performance of abortions; and 3) permanently enjoin the Secretary and all relevant persons from enforcing 42 U.S.C. § 300a-7(c)(1) and (c)(2) against entities that oppose abortion for sincere religious reasons, to the extent those provisions forbid discrimination against physicians and health-care personnel that performed or assisted in the performance of abortions. *Id.* at 15.

### C.  Defendants' Motion to Dismiss

Defendants argue that all claims must be dismissed. On the first claim—relating to the 2019 Rule and Title X—Defendants contend that Vita Nuova is not injured because Vita Nuova does not object to the 2019 Rule and the result of the ongoing lawsuits will not affect Vita Nuova's ability to participate in the Title X program. Defs.' Mot. Dismiss 1, 10, ECF No. 17. Defendants then lay out HHS's "longstanding policy" to not enforce the former rule's abortion referral and counseling requirements against religiously objecting entities. *Id.* (citing 84 Fed. Reg. 23,170, 23,191 n.64 (May 21, 2019)). Defendants then state that Vita Nuova's argument—that the 2019

Rule is certain to be revoked if a Democratic Administration takes office in January 2021—is too speculative to confer standing. *Id.* at 12–13.

As to the second claim—relating to 45 C.F.R. § 75.300(d)—Defendants argue that this claim is moot because HHS issued a "Notice of Non-Enforcement" informing the public that § 75.300(d) would not be enforced. Defs.' App. Supp. Mot. Dismiss Ex. A (Notice of Non-Enforcement), App. 2–11, ECF No. 17-1. Further, Defendants contend that Vita Nuova has not alleged any actual injury from § 75.300(d), has never applied for Title X funds, and does not plead facts demonstrating that it would be a qualified applicant or subrecipient for Title X funds. *Id.* Thus, Defendants claim that Vita Nuova's claim is "wholly speculative." *Id.* However, in the alternative, Defendants indicate that even if Vita Nuova did plead facts showing that § 75.300(d) applies, there is no allegation of credible threat that the regulation will be enforced against it. *Id.* at 14–15. Specifically, Defendants highlight that Vita Nuova does not identify one instance where HHS previously penalized an award recipient because the recipient does not recognize same-sex marriage. *Id.* at 15.

Finally, as to the third claim—relating to 42 U.S.C. § 300a-7(c)—Defendants argue that Vita Nuova fails to allege any concrete and imminent injury sufficient to confer Article III standing. Specifically, Defendants contend that Vita Nuova fails to adequately allege that it has been forced to employ individuals who perform or assist in the performance of abortions. Defs.' Mot. Dismiss 15, ECF No. 17. Further, Vita Nuova does not list whether it has any employees at all nor any prospective employees who have attempted to secure employment with it despite performing or assisting with abortion services. *Id.* at 16.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A court dismisses a case under Rule 12(b)(1) for lack of subject matter jurisdiction if it "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers," *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation marks omitted), and so the burden of proof on a Rule 12(b)(1) motion rests with the party asserting jurisdiction. In ruling on a 2(b)(1) motion, a court may rely upon: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659, (5th Cir. 1996) (quotation marks omitted). A court should "consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### 2. Standing

The Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., art. III, § 2. A principal idea underlying Article III's case-or-controversy requirement is the doctrine of standing. "Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). "The doctrine of standing asks 'whether the litigant is entitled

to have the court decide the merits of the dispute or of particular issues.'" *Id.* (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).

The Supreme Court has established that the "irreducible constitutional minimum of standing contains three elements. . . First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant . . . .'" *Id.* at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (cleaned up)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon*, 426 U.S. at 38, 43, 96).

### III. DISCUSSION

As the party invoking jurisdiction, Vita Nuova must show the requirements of standing are satisfied. *See Ramming*, 281 F.3d at 161. Defendants attack all three of Vita Nuova's claims on jurisdictional grounds. The Court will address each claim in the order presented.

#### A. Title X § 1008 (42 U.S.C. 300a-6)

Based on Defendants' brief in support of their Motion to Dismiss, there are two relevant issues:[8] 1) whether HHS's long-standing policy of exempting religious entities from abortion-counseling and abortion-referral requirements defeats standing; and 2) whether Vita Nuova's injury is too conjectural or speculative. Vita Nuova has acknowledged that it can no longer pursue its now-abandoned APA claims against the rule requiring that Title X projects must provide

---

[8] Defendants bring up two other issues: 1) mootness; and 2) that declaratory relief either contradicts or collaterally attacks any injunction issued against enforcement of the 2019 Rule. *See* Defs.' Mot. Dismiss 8–10, ECF No. 17. The Court need not and does not reach these issues because these arguments are made in the alternative and do not impact the standing analysis. *See id.* at 10; Defs.' Reply 11, ECF No. 25.

counseling and referrals for abortion upon request (hereinafter the "2000 Rule") in light of the Ninth Circuit's announcement, because a court cannot set aside an agency rule that has been repealed by subsequent legislation. Pl.'s Resp. 12, ECF No. 18. As a result, the Court's focus is solely on whether Vita Nuova has standing for declaratory relief in light of the 2019 Rule.

> 1. <u>Because non-enforcement is irrelevant if the law is valid for future administrations' enforcement against Vita Nuova, HHS's long-standing policy of exempting religious entities from abortion-counseling and abortion-referral requirements does not defeat standing.</u>

Defendants emphasize that HHS, through an exercise of an enforcement discretion, did not and has not required religiously objecting entities like Vita Nuova to provide abortion referrals or abortion counseling, even prior to the 2019 Rule. Defendants go so far as to state that "even if a court subsequently vacates the 2019 Rule or reinstates the nationwide injunctions against its enforcement, there is no reason to expect that any such hypothetical decision would have the effect of requiring religiously objecting entities like Vita Nuova to provide abortion referrals or abortion counseling." Defs.' Mot. Dismiss 12, ECF No. 17.

In *Stenberg v. Carhart*, 530 U.S. 914 (2000), the Supreme Court considered a sub-issue of whether the Attorney General of Nebraska's interpretation of a statute—which would lead to nonenforcement of certain abortion procedures—was appropriate. Such an interpretation implied that certain abortion procedures would not be prosecuted. While the issue was decided on other grounds, the Supreme Court stated that having the current law on the books would allow "some present prosecutors and future Attorneys General to choose to pursue physicians who use such procedures." *Id.* at 944–45 (cleaned up). The Supreme Court recognized that having a valid law on the books—which would cause injury if individual prosecutors or future administrations choose to prosecute—renders nonenforcement ineffectual for the purpose of concluding that a party does

not have Article III standing.⁹ This argument is inapposite for the 2019 Rule, as the 2019 Rule does not harm Vita Nuova, and the 2000 Rule is now defunct.

> 2. <u>Because layers of hypothetical events must come to fruition before Vita Nuova could suffer a concrete harm, its alleged injuries are conjectural and speculative</u>.

Still, Vita Nuova claims it is suffering future injury because of the uncertainty surrounding the 2019 Rule. Vita Nuova also argues that it is suffering present-day injury because potential donors are unwilling to commit unless they get a guarantee that Vita Nuova's prospective Title X funding will not be encumbered by a change in administration or a revocation of the 2019 Rule.

> i. *Future Injury*

As discussed above, an injury must be concrete, particularized, and actual or imminent. In the case of future injuries, imminence is usually paramount. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2 (emphasis in original) (cleaned up)). The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (cleaned up)).

Vita Nuova's claim of future injury presents a couple layers of conjecture. First, for Vita Nuova to show injury, a different administration must take office in January 2021. This is far from predictable, and Vita Nuova pleads no facts showing certainty. Second, that administration must revoke the 2019 Rule *and* return it to some form of the 2000 Rule stating a requirement of abortion

---

⁹ *Stenberg* does not directly analyze standing. Rather, it implies that nonenforcement is not a *per se* disqualification of a showing of injury in fact. *See Stenberg*, 530 U.S. at 944–45.

referrals or counseling to remain in the Title X program. Without certainty for the antecedent event, this is likewise conjectural. Defendants contend there is a tertiary layer here; Vita Nuova would still not be required to provide abortion referrals or counseling to remain in the Title X program unless the hypothetical Democratic administration revoked the 2019 Rule, returned it to some form of the 2000 Rule, *and* abandoned the preexisting policy—which previous Democratic administrations have upheld—of nonenforcement for religiously objecting entities. This last layer runs into the same problem as *Stenberg*—the existence of a valid law on the books that a prosecutor or future administration could use to bring suit. However, this last layer cannot and does not change the outcome of this issue because the first two layers of threatened injury have not been proven to be certainly impending. Thus, Vita Nuova's claim of future injury cannot survive Defendants' Motion to Dismiss.

### ii.  Present Injury

Vita Nuova claims that its alleged present injury—inhibition of fundraising efforts—is connected to its alleged future injury. However, this case is similar to the Supreme Court's *Clapper* case such that Vita Nuova's alleged present injury cannot establish standing without first showing there is a certainly impending future injury. 568 U.S. at 401–02. In *Clapper*, the respondents claimed they could establish injury in fact because their work made them likely targets of surveillance under a Foreign Intelligence Surveillance Act provision. *Id.* at 401. The Supreme Court ruled that this was too speculative because they could not demonstrate such surveillance was certainly impending. *Id.* In the alternative, the respondents claimed they were suffering present injury because the risk of surveillance already forced them to make costly expenditures to protect their confidential communications. *Id.* at 402. The Supreme Court rejected the argument and stated

that "respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.*

This case presents a comparable scenario: an alleged future injury that is not certain to happen and a present injury related to loss of funds based on the future injury. Rather than direct expenditures, as was present in *Clapper*, Vita Nuova is suffering withheld funds because it does not have a declaratory judgment that insulates them from changing interpretations of § 1008 by future administrations or otherwise. For the purposes of standing, the Court sees no appreciable difference between direct expenditures and the withholding of funds as it relates to loss attributed to an uncertain future harm. That is to say: Vita Nuova may not manufacture standing through the affidavits of potential donors withholding funds when it cannot show a certainly impending future injury. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416. The Court is particularly cognizant of this reasoning, because otherwise allowing standing in these situations would open the floodgates to federal courts so long as a plaintiff could show a not-insignificant loss tied to a subjective fear of unproven harm. This is an unmanageable standard capable of considerable abuse. As such, Vita Nuova's claim of present injury cannot survive Defendants' Motion to Dismiss.

### B. 45 C.F.R. § 75.300(d)

Defendants make additional arguments toward Vita Nuova's second claim; in addition to the contentions that the claim is speculative and moot because of nonenforcement, Defendants argue that Vita Nuova has not alleged any actual injury from § 75.300(d), has never applied for Title X funds, and does not plead facts demonstrating that it would be a qualified applicant or subrecipient for Title X funds. This previously untried argument fails.

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (hereinafter "*Northeastern*"). Based upon the rule articulated in *Northeastern*, Vita Nuova does not have to plead that it would be a qualified recipient for Title X funds because the presence of § 75.300(d) as a barrier is enough.

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) also illuminates the injury-in-fact question presented by Vita Nuova's second claim. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). *Driehaus* allows the Court to synthesize Defendants remaining arguments into two intelligible issues: 1) whether Vita Nuova needed to apply for Title X funds to satisfy the injury-in-fact requirement; and 2) whether there exists a credible threat of prosecution despite HHS's nonenforcement of § 75.300(d).

The first issue is simple enough; Vita Nuova has filed a sworn statement with the Court stating an intention to apply for Title X funds despite a valid regulation that may be enforced against Vita Nuova for its Christian beliefs regarding same-sex marriage. The focus, then, is whether there is a credible threat of prosecution despite HHS's nonenforcement of § 75.300(d). This scenario is much closer to *Stenberg*, where there is a valid law capable of being enforced despite an administration's statement or implication that it will not enforce the law in question.

However, the analysis does not end there. *Driehaus* examined several relevant factors[10] related to the threat of future enforcement: 1) history of past enforcement; 2) whether authority to file a complaint is limited to a prosecutor or agency; and 3) whether a party has disavowed enforcement if a plaintiff continues its course of action. *See* 573 U.S. at 164.

All three factors favor Defendants. First, Vita Nuova provides no example of former enforcement, and Defendants note their history of nonenforcement. Second, the authority to file suit is limited to a prosecutor or government agency because Title X deals with federal funds. As such, the general public does not have standing to file a grievance. *See generally Flast v. Cohen*. 392 U.S. 83 (1968). Third, Defendants have expressly disavowed enforcement of § 75.300(d). With the limited authority to file suit, this means Vita Nuova stands a negligible chance of being prosecuted under § 75.300(d). Because there exists little to no credible threat of enforcement related to 45 C.F.R. § 75.300(d), Vita Nuova's second claim cannot survive Defendants' Motion to Dismiss.

### C.  42 U.S.C. 300a-7(c)

Finally, Defendants argue that third claim must be dismissed because "Plaintiff fails to allege any concrete and imminent injury sufficient to confer Article III standing." Defs.' Mot. Dismiss 15, ECF No. 17. Specifically, they argue that Vita Nuova has not alleged that it has been forced to employ any individuals who perform or assist in the performance of abortions. *Id.* Moreover, they state that it's unclear whether Vita Nuova has any current or prospective employees. *Id.* at 16. Vita Nuova counters by saying that 42 U.S.C. § 300a-7(c) is inflicting present day injury—as well as a substantial risk of future injury—because it prohibits Vita Nuova from

---

[10] *Driehaus* also examines the frequency of proceedings for fielding complaints, but this is inapplicable to this case. *See* 573 U.S. at 164–65.

receiving Title X funds unless it changes employment practices and stops discriminating against those who provide abortive procedures. Pl.'s Resp. 16, ECF No. 18.

This set of arguments presents a parallel to the arguments submitted on present and future injury over § 1008—albeit with different facts. By the same token, the relevant questions are: 1) whether the future injury is certainly impending; and 2) whether the present injury meets Article III standing on its own. Vita Nuova prevails on the latter.

First, the substantial risk of future injury cannot be shown because there is a hypothetical event that has no certainty of happening—the employment of individuals who perform or assist in elective abortions. More to the point, there needs to be something certain, beyond pure speculation, of a future event before the Court can determine that a statute imposes an Article III injury on Vita Nuova. Otherwise, employers everywhere could challenge statutes on the supposition that an imagined prospective employee—possessing such characteristics or performing such acts that would go against the employer's wishes—will appear and coincidentally create standing. This creates an absurd result: basing standing on an individual that does not yet exist. From that alone, Vita Nuova's claim of future injury cannot survive Defendants' Motion to Dismiss.

Second, Vita Nuova's alleged present injury—42 U.S.C. § 300a-7's prohibition of Vita Nuova from receiving Title X funding—does not facially submit itself as having an actual or concrete injury because it refers to receiving future funds. However, the Court recognizes this injury is not conjectural because of the law articulated in *Northeastern*; Vita Nuova need not show it would successfully obtain Title X funding as an applicant because the injury in fact is the presumptive denial of Title X funding that stems from 42 U.S.C. § 300a-7(c)'s encumbrance. Put another way, Vita Nuova does not need to show it has employees to show a present injury under 42 U.S.C. § 300a-7(c); the statute's barrier provides an actual injury to Vita Nuova's ability to

receive Title X funding because the text of the statute does not allow an entity with sincere religious beliefs to "discriminate" against individuals who perform sterilization or abortion procedures. *Id.* at (c)(1). Vita Nuova attests that it has policies that run against § 300a-7(c), and it will never agree to change those policies as a condition of receiving federal funds. *See* Pl.'s Resp. 15–16, ECF No. 18. Indeed, Vita Nuova is forced to choose between obtaining Title X funding or continuing to adhere to its sincerely held religious beliefs regarding the sanctity of human life.

Moreover, the text of 42 U.S.C. § 300a-7 prohibits public officials or authorities from requiring individuals to perform sterilization or abortion procedures if such procedures go against that individual's religious beliefs or moral convictions. *Id.* at (b)(1). Even so, the statute does not grant an exception for entities—such as Vita Nuova—who would refuse to hire, refuse to promote, or terminate individuals who perform sterilization or abortion procedures despite the entity's sincerely held religious beliefs or moral convictions. *See id.* at (c)(1)–(2). This appears incongruent, and Defendants neither brief whether such an exception or accommodation exists nor claim non-enforcement of the provision against Vita Nuova. As a result, Vita Nuova's present injury—traceable to 42 U.S.C. § 300a-7—can be redressed by Vita Nuova's proposed relief, and the claim survives Defendants' Motion to Dismiss.

## IV. CONCLUSION

Based on the reasoning above, the Court finds that Defendants' Motion to Dismiss is **GRANTED** as to Vita Nuova's first and second claims and **DENIED** as to Vita Nuova's third claim. Accordingly, Vita Nuova's first and second claims are **DISMISSED** because they do not meet Article III standing requirements, but Vita Nuova's third claim—against 42 U.S.C. § 300a-7(c)(1)–(2) of the Church Amendments—may proceed.

**SO ORDERED** on this **1st day** of **May, 2020**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE