UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **Vita Nuova Inc.**, on behalf of itself and others similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>**Alex M. Azar II**, in his official capacity as Secretary of Health and Human Services; **United States of America**,<br><br>　　　　　Defendants. | Case No. 4:19-cv-00532-O |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff
and the Proposed Class*

## TABLE OF CONTENTS

Table of contents ...................................................................................................................i

Table of authorities ...............................................................................................................ii

Undisputed facts ....................................................................................................................1

Vita Nuova is entitled to summary judgment ......................................................................1

    I.  42 U.S.C. § 300a-7(c) substantially burdens Vita Nuova's exercise of religion ........2

    II.  There is no "compelling governmental interest" in requiring religious health-care providers to employ individuals who perform or assist abortions ......................6

Conclusion ...........................................................................................................................11

Certificate of conference ....................................................................................................12

Certificate of service ...........................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Bob Jones University v. United States*, 461 U.S. 574 (1983)...................................................9
*Boy Scouts v. Dale*, 530 U.S. 640 (2000).................................................................8, 9, 10
*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)............................................passim
*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...........................................................................6
*Espinoza v. Montana Dept. of Revenue*, No. 18-1195 (2020) ................................................5
*McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465 (5th Cir. 2014).........................7
*Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Services*,
   801 F.3d 927 (8th Cir. 2015)..................................................................................4
*Sherbert v. Verner*, 374 U.S. 398 (1963) ........................................................................4
*Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013) ......................................................6
*United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*,
   493 F.2d 799 (5th Cir. 1974)..................................................................................7

**Statutes**

42 U.S.C. § 2000bb-1(a)................................................................................................2
42 U.S.C. § 2000bb-1(b) ...........................................................................................2, 6
42 U.S.C. § 2000bb-1(b)(1)–(2) ..................................................................................2
42 U.S.C. § 2000bb-2(4) ............................................................................................3
42 U.S.C. § 2000cc-5(7)(A).........................................................................................3
42 U.S.C. § 300a-7(c) .........................................................................................passim
42 U.S.C.A. § 2000cc-3(g)...........................................................................................3

**Other Authorities**

Ron Hamel, *Healing Begins With Our Hearts*, 93 Health Progress 70
   (2012)................................................................................................................3
United States Conference of Catholic Bishops, *Ethical and Religious
   Directives for Catholic Health Care Services* (6th ed. 2018) ...............................2

Plaintiff Vita Nuova Inc. respectfully moves for summary judgment on behalf of itself and the class that it seeks to represent. Vita Nuova also requests a permanent injunction that will prevent the defendants from enforcing 42 U.S.C. § 300a-7(c) against health-care providers that oppose abortion for sincere religious reasons.

## UNDISPUTED FACTS

Vita Nuova is a Christian, pro-life organization that wishes to participate in the federal government's Title X program. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶¶ 3, 11. But 42 U.S.C. § 300a-7(c) prohibits entities from receiving federal funds unless they allow their employees to perform or assist abortions, and it makes no exemptions or accommodations for organizations (such as Vita Nuova) that oppose abortion for sincere religious reasons. Vita Nuova, however, requires its employees to respect the sanctity of human life at all times, both on and off the job. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶ 7. Vita Nuova will not allow its doctors to perform elective abortions, nor will it allow its employees to assist elective abortions, consistent with the employment practices of Catholic hospitals and other Christian health-care entities that oppose abortion for sincere religious reasons. *See id*.

Vita Nuova believes that 42 U.S.C. § 300a-7(c) violates the Religious Freedom Restoration Act by failing to exempt health-care providers that oppose abortion for sincere religious reasons, and it seeks summary judgment and a permanent injunction that will prevent the defendants from enforcing the statute against Vita Nuova and the putative class members.

## VITA NUOVA IS ENTITLED TO SUMMARY JUDGMENT

The Religious Freedom Restoration Act "was designed to provide very broad protection for religious liberty," which extends "far beyond what this Court has held is constitutionally required." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014); *id*. at 695 n.3 ("RFRA did more than merely restore the balancing test used

in the *Sherbert* line of cases; it provided even broader protection for religious liberty than was available under those decisions."). To prevail on a RFRA claim, a plaintiff need only show that 42 U.S.C. § 300a-7(c) substantially burdens its exercise of religion. 42 U.S.C. § 2000bb-1(a). Then the burden shifts to the government to demonstrate that its imposition furthers a "compelling governmental interest" and is the "least restrictive means" of doing so. 42 U.S.C. § 2000bb-1(b)(1)–(2).

### I.  42 U.S.C. § 300a-7(c) Substantially Burdens Vita Nuova's Exercise Of Religion

42 U.S.C. § 300a-7(c) forces Vita Nuova and the putative class members to choose between: (1) allowing the employment of individuals who perform or assist elective abortions; or (2) disqualifying themselves from federal funding. This substantially burdens their exercise of religion.

Vita Nuova, like other Christian health-care providers, offers its services as an act of Christian ministry. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶ 8 ("Jesus instructed his disciples to heal the sick. . . . Vita Nuova seeks to provide needed healthcare services to women to fulfill this divine command, and to do so as a component of Christian ministry."); *see also* United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (6th ed. 2018), "General Introduction," page 6 ("The Church has always sought to embody our Savior's concern for the sick. . . . The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ."), available at http://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-

2016-06.pdf (last visited on June 30, 2020).[1] The provision of health care by Vita Nuova and the putative class members—which is done to imitate the example of Christ and to provide Christian love to those in need—undoubtedly qualifies as an "exercise of religion" within the meaning of the Religious Freedom Restoration Act. *See* 42 U.S.C. § 2000bb-2(4) ("[T]he term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title."); 42 U.S.C. § 2000cc-5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."); 42 U.S.C.A. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."); *see also Hobby Lobby*, 573 U.S. at 696. Vita Nuova's insistence that its employees refrain from performing or assisting abortions is likewise an "exercise of religion" under section 2000bb-2(4). *See Hobby Lobby*, 573 U.S. at 691 (unwillingness to fund abortifacient contraception is an "exercise of religion" protected by RFRA). Vita Nuova's belief in the sanctity of human life and its opposition to abortion is rooted in the Bible and millennia of Christian teaching on the subject. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶¶ 6–10; *see also* Affidavit of E. Christian Brugger (ECF No. 34-3) at ¶ 14–15 (citing the Bible and authorities from the early Christian church).

---

1. *See also* Ron Hamel, *Healing Begins With Our Hearts*, 93 Health Progress 70, 70–71 (2012) ("Healing is integral to the mission and ministry of Jesus. . . . Jesus' special concern for and healing of the sick is integral to the reign of God, to making God's way present in the world. He tells the 12 apostles: 'The kingdom of heaven is at hand. Cure the sick, raise the dead, cleanse lepers, drive out demons' (Matthew 10:7–8; 11:2–5). This work he handed over to his followers and sent them forth into the world to be God's healing and reconciling presence in the world."), available at: https://www.chausa.org/docs/default-source/health-progress/580ebb11f8b648efa6d6a0720f557fd11-pdf.pdf?sfvrsn=0 (last visited on June 30, 2020).

42 U.S.C. § 300a-7(c) substantially burdens this exercise of religion by disqualifying Vita Nuova—and every other religious health-care provider that opposes abortion—from federal funds unless they allow the employment of individuals who perform or assist elective abortions. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963) ("[T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties."); *Hobby Lobby*, 573 U.S. at 710 ("[A] law that 'operates so as to make the practice of . . . religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)). As the Supreme Court explained in *Sherbert*:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Sherbert*, 374 U.S. at 406. So too here. The statute forces Vita Nuova and the putative class members "to choose between" following the precepts of their religion and forfeiting their eligibility for federal funding, on the one hand, and abandoning a precept of their religion in order to preserve their eligibility for federal funds, on the other. The "imposition of such a choice" substantially burdens their exercise of religion. *See id.*; *Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Services*, 801 F.3d 927, 937 (8th Cir. 2015) ("Under RFRA, the government substantially burdens the exercise of religion when it 'conditions receipt of an important benefit upon conduct proscribed by a religious faith' or 'denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" (quoting *Thomas v. Review Bd. of Ind. Emp't Sec.*

*Div.*, 450 U.S. 707, 717–18 (1981)); *see also* Affidavit of E. Christian Brugger (ECF No. 34-3) at ¶ 19 (explaining how a decision to "relinquish and forgo federal funding" can "destroy an institution's financial viability" when the federal government pays for 28% of health-care spending in the United States); *cf. Espinoza v. Montana Dept. of Revenue*, No. 18-1195, slip op. at 8 (2020) ("[T]he Free Exercise Clause protects against laws that penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens" (citation and internal quotation marks omitted)).

If Vita Nuova allowed its employees to perform or assist elective abortions, it would undermine Vita Nuova's Christian witness. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶ 8. An organization cannot credibly maintain that it promotes Christian values—including the sanctity of human life at all stages—if it allows its employees to behave in a manner that directly contradicts the values that the organization purports to uphold. *See id*. This is true not only for Vita Nuova, but for every health-care provider affiliated with the Catholic Church, which prohibits "cooperation" with abortion in any form. As Professor Brugger explains:

> [T]he Catholic Church in the United States prohibits all of its more than 2,000 healthcare facilities from any kind of moral "cooperation" with abortion. . . . This prohibition extends to the performance of abortions on the premises of Catholic facilities, the hiring of doctors who perform abortions, including those who perform them off premises, and even the granting of hospital privileges to doctors who perform abortions, even should they promise that their visits would be unrelated to abortion. The dangers of scandal and of the undermining of a Catholic institution's witness to the sanctity of human life are serious enough to justify a total prohibition: no cooperation—no complicity—with abortion is permissible.

Affidavit of E. Christian Brugger (ECF No. 34-3) at ¶ 16–17 (citing *Ethical and Religious Directives for Catholic Health Care Services*, Directive No. 45; *see also id*., Directive Nos. 67, 68, 70–71, 76; Part VI, "Introduction," pp. 24–25.). 42 U.S.C.

§ 300a-7(c) substantially burdens the exercise of religion by imposing this "toxic dilemma between the Scylla of institutional conscience violation and the Charybdis of financial non-viability." Affidavit of E. Christian Brugger (ECF No. 34-3) at 22.

* * *

Having shown a "substantial burden" on the plaintiffs' religious liberty, the burden now shifts to the government to demonstrate that 42 U.S.C. § 300a-7(c) advances a "compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and 42 U.S.C. § 300a-7(c) comes nowhere close to satisfying this standard.

## II. THERE IS NO "COMPELLING GOVERNMENTAL INTEREST" IN REQUIRING RELIGIOUS HEALTH-CARE PROVIDERS TO EMPLOY INDIVIDUALS WHO PERFORM OR ASSIST ABORTIONS

The relevant "governmental interest" cannot be described with vague abstractions, such as promoting "nondiscrimination." *See Hobby Lobby*, 573 U.S. at 726 (rejecting the government's attempt to frame the "governmental interests" in abstract terms such as "promoting public health" or "gender equality"). Instead, a court must "'look beyond broadly formulated interests' and . . . 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the [statute] in these cases." *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). The relevant question is not whether 42 U.S.C. § 300a-7(c) advances a compelling governmental interest, but whether its *refusal to exempt religious objectors* advances such an interest. *See Tagore v. United States*, 735 F.3d 324, 330–31 (5th Cir. 2013) ("RFRA requires the government to explain how applying the statutory burden "to the person" whose sincere exercise of religion is being seriously impaired

furthers the compelling governmental interest."). And the government cannot show that its desire to protect health-care workers who perform or assist abortions from discrimination is a policy of such overriding importance that no religious exemptions can be made.

The first and most obvious problem is that 42 U.S.C. § 300a-7(c)'s anti-discrimination rule applies only to entities that receive federal funding; the government is content to allow health-care providers who decline federal money and other employers to discriminate against health-care workers who perform or assist abortions. If there truly were a "compelling governmental interest" in protecting health-care workers who perform or assist abortions from discrimination—an interest so compelling as to allow for *no* exemptions, not even for religious objectors—then Congress would enact legislation under its commerce-clause powers to prohibit *any* employer from discriminating against individuals based on their involvement in abortion, regardless of whether they receive federal funds. When the government is giving carte blanche to health-care providers to discriminate against abortionists, so long as those providers are not accepting federal money, it cannot credibly assert that it has a "compelling" interest in suppressing this behavior by religious institutions as soon as they accept federal funds. A "compelling governmental interest" is found in laws that impose universal obligations; a requirement that attaches only after federal money is accepted is not the stuff of which "compelling governmental interests" are made.[2]

---

2. *See, e.g.*, *See McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) ("Where a regulation already provides an exception from the law for a particular group, the government will have a higher burden in showing that the law, as applied, furthers the compelling interest."); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 809 (5th Cir. 1974) ("The only interests which City has seriously suggested as 'compelling' are faithfulness to its Master Plan and faithfulness to its annexation policy. But when we recall that the City has already made significant exceptions to both its land use and its annexation policies, this contention loses much of its force.").

The second problem is that *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), is incompatible with the notion that non-racial anti-discrimination laws establish "compelling governmental interests" that override First Amendment freedoms. The Boy Scouts of America excluded homosexuals from membership because it regarded homosexual conduct as "inconsistent with the values it seeks to instill." *Id*. at 644; *see also id*. at 650 ("[H]omosexual conduct is inconsistent with the values embodied in the Scout Oath and Law, particularly with the values represented by the terms 'morally straight' and 'clean.'"). The New Jersey Supreme Court held that this policy violated the state's anti-discrimination laws, and it held that the State had "a compelling interest" in eliminating discrimination—which trumps whatever First Amendment interests the Boy Scouts might assert. *See id*. at 647 (citing *Dale v. Boy Scouts of America*, 734 A.2d 1196, 1227 (N.J. 1999)). The Supreme Court of the United States, however, reversed the New Jersey Supreme Court and held that New Jersey's anti-discrimination laws violated the Boy Scouts' constitutional right of expressive association. *See id*. at 659.

In ruling that the Boy Scouts' First Amendment rights trumped New Jersey's anti-discrimination laws, the Supreme Court acknowledged that the constitutional right of expressive association is "not absolute," and "could be overridden by regulations adopted to serve compelling state interests." *Id*. at 648 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (internal quotation marks omitted)); *see also id*. ("We have held that the freedom could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" (quoting *Roberts*, 468 U.S. at 623 (internal quotation marks omitted)). But the Court ruled for the Boy Scouts anyway, and in doing so it rejected the notion of a "compelling governmental interest" in deterring or suppressing discrimination against homosexuals by private organizations.

The *Boy Scouts* case would surely have been decided differently if the Boy Scouts were discriminating on the basis of race rather than homosexuality, and the Supreme Court has consistently held that the government's interest in eradicating racial discrimination is sufficiently "compelling" to prevail over any claim of religious liberty. *See Bob Jones University v. United States*, 461 U.S. 574, 604 (1983); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."). But the Supreme Court's refusal to allow a non-racial antidiscrimination law to trump the Boy Scouts' associational freedom defeats any claim that the government will have a "compelling interest" in preventing discrimination whenever it enacts a statute to achieve such a goal.

Indeed, the situation in *Boy Scouts* is almost indistinguishable from the situation in this case. The Boy Scouts of America excluded homosexuals from membership because homosexual conduct was incompatible with the values that the Boy Scouts sought to instill and express. *See Boy Scouts*, 530 U.S. at 644 ("The Boy Scouts is a private, not-for-profit organization engaged in instilling its system of values in young people. The Boy Scouts asserts that homosexual conduct is inconsistent with the values it seeks to instill."). In like manner, Vita Nuova and the putative class members refuse to employ individuals who perform or assist abortions because abortion is contrary to the values and religious mission of their organizations. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶¶ 3, 6–10; Affidavit of E. Christian Brugger (ECF No. 34-3) at ¶ 14–17.

The Boy Scouts also insisted that the presence of a homosexual scoutmaster "would significantly burden the Boy Scouts' desire to not promote homosexual conduct as a legitimate form of behavior"—even if the scoutmaster's homosexual conduct and expressions of pro-homosexual viewpoints took place entirely outside his

work with the Boy Scouts. *Boy Scouts*, 530 U.S. at 653 (citation and internal quotation marks omitted). In like manner, Vita Nuova and the putative class members claim that the employment of practicing abortionists or individuals who assist abortions would interfere with their efforts to discourage abortion, and would undermine their ability to operate as overtly Christian and pro-life health-care providers. *See* Affidavit of Carol Everett (ECF No. 34-2) at ¶¶ 8 ("Allowing our employees to perform or assist elective abortions—even if they do so while off the job—would directly undermine Vita Nuova's Christian witness. . . . An organization cannot credibly maintain that it promotes Christian values—including the sanctity of human life at all stages—if it is willing to employ individuals who behave in a manner that directly contradicts the organization's values."); Affidavit of E. Christian Brugger (ECF No. 34-3) at ¶ 17 ("The dangers of scandal and of the undermining of a Catholic institution's witness to the sanctity of human life are serious enough to justify a total prohibition: no cooperation—no complicity—with abortion is permissible.").

Of course, Vita Nuova is not asserting a First Amendment claim rooted in the right of expressive association; it is asserting a claim under the Religious Freedom Restoration Act. And the Boy Scouts' refusal to accept homosexual scoutmasters was not an exercise of religion; it was a secular conviction that regarded homosexual behavior as incompatible with the Scout Oath and Law, which require a Scout to be "morally straight" and "clean." *Boy Scouts*, 530 U.S. at 667. But the need for the government to show a "compelling interest" is the same in each of these cases. And if New Jersey lacked a compelling interest in enforcing its anti-discrimination laws against the Boy Scouts, then it is hard to see how the government can possibly have a "compelling governmental interest" in enforcing 42 U.S.C. § 300a-7(c) against Vita Nuova and other health-care providers who object to abortion for sincere religious reasons.

## CONCLUSION

  The plaintiff's motion for summary judgment and permanent injunction should be granted.

                  Respectfully submitted.

                   /s/ Jonathan F. Mitchell

H. Dustin Fillmore III       Jonathan F. Mitchell
Texas Bar No. 06996010      Texas Bar No. 24075463
Charles W. Fillmore        Mitchell Law PLLC
Texas Bar No. 00785861      111 Congress Avenue, Suite 400
The Fillmore Law Firm, LLP     Austin, Texas 78701
1200 Summit Avenue, Suite 860   (512) 686-3940 (phone)
Fort Worth, Texas 76102      (512) 686-3941 (fax)
(817) 332-2351 (phone)      jonathan@mitchell.law
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

                  *Counsel for Plaintiff and*
Dated: June 30, 2020        *the Proposed Class*

# CERTIFICATE OF CONFERENCE

I certify that on June 29, 2020, I conferred with Bradley Humphreys, counsel for the defendants, and he informed me that the defendants oppose this motion.

      /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff*
*and the Proposed Class*

# CERTIFICATE OF SERVICE

I certify that on June 30, 2020, I served this document through CM/ECF upon:

Bradley P. Humphreys
Daniel Reiss
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 305-0878 (phone)
(202) 616-8460 (fax)
bradley.humphreys@usdoj.gov
daniel.riess@usdoj.gov

*Counsel for the Defendants*

      /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff*
*and the Proposed Class*